IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DERRICK E. SWANSON,                )
                                  )
        Plaintiff,                )
                                  )
    v.                            )       CIVIL CASE NO. 3:23-cv-291-ECM
                                  )              [WO]
CITY OF TUSKEGEE, ALABAMA,        )
                                  )
        Defendant.                )

## MEMORANDUM OPINION and ORDER

## I. INTRODUCTION

This case concerns the termination of Derrick E. Swanson ("Swanson"), the former city manager for the City of Tuskegee, Alabama ("the City"), after he requested leave under the Family Medical Leave Act, 29 U.S.C. § 2615 ("FMLA" or the "Act"). Swanson claims that the City willfully interfered with his request for FMLA leave and retaliated against him for requesting FMLA leave. He also brings a state law claim for defamation.

Now pending before the Court is the City's motion for summary judgment. (Doc. 33). The motion is fully briefed and ripe for review. After reviewing the parties' submissions, the Court finds that the motion (doc. 33) is due to be denied.

## II. JURISDICTION

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to § 1367. The parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### III.  STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*,

2

475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the Court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTS

The following facts, taken in the light most favorable to Swanson, are as follows:

In December 2020, Swanson became interim city manager of the City. The city manager, who is considered a full-time City employee, is the head of the administrative branch of the municipal government and is responsible for the enforcement of all laws and ordinances, among other things. (Doc. 33-2; doc. 33-4 at 21). The city manager also handles day to day operations and manages employees. (Doc. 33-4 at 7).

The City uses a "mayor-council" form of government. (Doc. 33-4 at 7). At all relevant times, Lawrence "Tony" Haygood ("Haygood") was the City's mayor and the

chief elected official, serving as the representative for external matters while also serving on the city council as a voting member. (*Id.*).  Haygood's testimony was inconsistent about whether the mayor alone has the power to hire and fire employees. (*See id.* at 8).  The city council is the only entity which handles the hiring of a city manager. (Doc. 33-2 at 30). The entire council, including Haygood, evaluates the city manager's performance. (Doc. 33-4 at 8).

In March 2021, the city council voted to appoint Swanson as permanent city manager, and Swanson signed a resolution establishing his employment agreement for the position. (Doc. 33-2 at 9–10).  As city manager, Swanson's duties and responsibilities were determined by ALA. CODE § 11-43(A)(28). (*Id.* at 10).   In the event of his temporary absence or disability, the city manager has the authority to "designate by letter filed with the city clerk a qualified administrative officer of the municipality" to perform his duties. (*Id.* at 11).  "In the event of failure of the manager to make such a designation, the council may by resolution appoint a called administrative officer of this municipality to perform the duties of the manager until he shall return or his disability shall cease." (*Id.*).

On March 9, 2023, the city clerk, Fartima B. Clark ("Clark"), emailed Haygood and city councilmembers that they were to meet on March 13, 2023, to evaluate Swanson's performance. (*Id.* at 18–19).  According to Swanson, he did not learn about the meeting until the day it took place.  On Monday, March 13, 2023, the meeting began sometime around 1:30 p.m. (*Id.* at 26).   Haygood, Councilmember Johnny Ford ("Ford"), Councilmember Orlando Whitehead ("Whitehead"), Councilmember Norma Jackson ("Jackson"), Clark, and Swanson were all present. (*Id.* at 21).  Councilmember Frank

Chriss Lee ("Lee") was not present. (*Id.*).  The evaluation proceeded, and each person at the meeting had a "city manager evaluation sheet" where they rated Swanson on a scale from 1 to 5:  1 being "unsatisfactory"; 2 being "improvement needed"; 3 being "meets expectations"; 4 being "exceeds expectations"; and 5 being "outstanding." (*Id.* at 22). Swanson was evaluated on the following categories:  professional skills, contractual performance, communication skills, and administrative skills and traits. (*Id.* at 22–23).

There were 135 possible points across the categories.  Haygood gave Swanson a total score of 69; Lee gave Swanson a total score of 61; Jackson gave Swanson 47 points; Ford gave Swanson 51 points; and Whitehead gave Swanson 76 points. (*Id.* at 24).  After receiving his scores, Swanson began to ask about how the mayor and city councilmembers came to these scores. (*Id.* at 25).  While he could not recall specifics, Swanson remembers the city council discussing where he could stand to improve. (*Id.* at 25–26).  Haygood testified that they began talking to Swanson about what he had done well and then discussed the council's concerns and suggestions, including hiring an assistant for the large workload. (Doc. 33-4 at 4, 9).  According to Haygood, some of the concerns were more serious, such as project funds that were unaccounted for, a lack of reporting, or unaddressed ordinance violations. (*Id.* at 4).

Haygood testified that while he could not remember Swanson's exact words, Swanson "clearly said, I am resigning today," and Swanson "walked out of the meeting and said he would come back to pick up his belongings later." (*Id.* at 22).  Haygood reiterated that Swanson "used the word 'resigning' or 'resignation' very clearly." (*Id.*). Clark, Jackson, Ford, and Whitehead all generally corroborate Haygood's testimony. (Doc.

33-7 at 4–5; doc. 33-9 at 2; doc. 33-10 at 2; doc. 33-11 at 2).[1]  Swanson acknowledged that

he got up and "said something" at the meeting, but he "can't remember exactly what it

was." (Doc. 33-2 at 30).  Although Swanson acknowledged that he does not have "any

evidence to refute" Haygood's and the others' testimony about what Swanson said during

the meeting (*id.* at 41–42), he maintained that he "did not resign" (*id.* at 44).

Swanson testified that he then felt the room close in on him and that he "needed to

get out before [he] said something [he] didn't need to say." (*Id.* at 31).  He testified that his

heart rate and breathing increased, and based on his years as a paramedic, he concluded

that he was having a panic attack. (*Id.* at 43).  Swanson remembers leaving the meeting,

briefly stopping by his office, and then going to see the City's Human Resources ("HR")

Director, Yolanda Jackson ("Yolanda").[2]  Yolanda handles all FMLA requests for the City.

(Doc. 33-5 at 22).  Swanson told Yolanda that he "needed help" and "a break" because

things were "not going well." (Doc. 33-2 at 32).  Swanson spoke to Yolanda for around ten

minutes, and while he does not remember specifics, he does remember Yolanda mentioning

the FMLA. (*Id.* at 32).  Yolanda testified that Swanson knocked on her door and asked,

"Ms. Jackson, what do I need to do to apply for FMLA?" (Doc. 33-5 at 17).  Yolanda then

---

[1] Swanson objects to the affidavits of Clark, Jackson, Ford, and Whitehead because, according to Swanson, they contain inadmissible hearsay, including statements allegedly made by Swanson. (Doc. 38 at 10–12). To the extent the affidavits relay statements allegedly made by Swanson, the alleged statements are an opposing party's statements and thus are not hearsay. *See* FED. R. EVID. 801(d)(2); *Agerton v. Escambia Cnty. Bd. of Educ.*, 2007 WL 9717585, at *4 n.3 (S.D. Ala. Aug. 17, 2007) (at summary judgment, denying motion to strike portion of an affidavit containing an admission by a party opponent based on FED. R. EVID. 801(d)(2)(D)).  In any event, the affidavits do not change the Court's conclusion that summary judgment is due to be denied as to Swanson's FMLA claims.  Consequently, Swanson's objections to the affidavits are overruled.

[2] The Court refers to Yolanda Jackson by first name not out of familiarity but instead to avoid confusion with Councilmember Norma Jackson.

explained what Swanson needed to do to apply for FMLA leave, and because she had a meeting she needed to get to, she asked if she could "get to him . . . at a later time." (*Id.* at 17).  Yolanda testified that Swanson had been there for the required one-year period and worked the required 1,250 hours for FMLA leave pending his physician certification. (*Id.* at 6).[3]

According to Yolanda, Swanson made a verbal request for FMLA leave in his meeting with her. (*Id.* at 16).  Yolanda advised Swanson that as of March 13, 2023, the day of his verbal request, he was approved for FMLA leave and that she would "make sure the proper paperwork was being submitted." (Doc. 33-2 at 47; doc. 33-5 at 4).  She then provided Swanson with a notice of his rights and responsibilities (doc. 38-8).  Consistent with federal law, the City requests thirty days' notice for FMLA leave requests unless it is an unforeseeable event. (Doc. 33-5 at 9).  Yolanda testified that Swanson gave proper notice of his need for FMLA leave under the City's procedures. (*Id.*).  Swanson was approved for FMLA leave through March 28, 2023, by which time his doctor would need to certify his leave. (Doc. 33-2 at 48; doc. 33-5 at 5).  Yolanda testified that the day after Swanson's request, she began gathering the paperwork for his request, including the physician certification. (Doc. 33-5 at 18).  When presented with a blank employee FMLA leave request form at her deposition, Yolanda testified that she had never seen the form before and that she has never required any employee requesting FMLA leave to sign the form. (*Id.* at 22).

---

[3] To be eligible for FMLA leave, the employee must have been employed for at least twelve months and for at least 1,250 hours during the twelve-month period. *See* 29 U.S.C. § 2611(2).

After speaking with Yolanda, Swanson left and drove home to "de-stress." (Doc. 33-2 at 32).   The next day, Tuesday, March 14, 2023, Swanson did not show up to a scheduled city council meeting.   Haygood called Swanson that day and sent Swanson text message from the city phone but received no response. (Doc. 33-4 at 25).   According to Haygood, he texted Swanson that the city council was "willing to continue working with him if [they] establish better communication." (Doc. 33-8 at 2).   Swanson testified that over the next few days, he took no action in his role as city manager, did not check his city-issued phone, and did not communicate with Haygood or the city council that he was not discharging his duties. (Doc. 33-2 at 33–34).   At some point over these few days, Swanson stopped by Yolanda's office to pick up his FMLA paperwork. (Doc. 33-5 at 18).

The morning of March 15, 2023, Haygood signed and mailed a letter to Swanson which stated:

> The end of the evaluation session on Monday, March 13, 2023, you indicated that you were resigning and departed the session. I attempted to make contact by phone on Tuesday morning and sent a text message as well.   While the City Council indicated that it was willing to work with you to seek to establish better communication and gain better understanding moving forward, we certainly respect your decision regarding what you determined to be best for you.   As you make a clear determination of your choice and intent, we request that you submit your intent in writing to the City Clerk's office no later than Friday afternoon, March 17, 2023, by 12:00 p.m.   If we do not receive a written response indicating your intent, we will assume your verbal notice of resignation as city manager on Monday was the official resignation notification to the City of Tuskegee.   Whichever path you choose, I, (we) wish you the best in all future endeavors.

(Doc. 38-12; doc. 33-4 at 25).  Clark relayed the same message to Swanson via email at 11:28 a.m. the same day. (Doc. 38-11; doc. 33-4 at 24; doc. 33-3 at 6–7; doc. 33-2 at 34). Haygood testified that the council was "clear what [Swanson] expressed [at the meeting] and what his intent was when he left," and they were "further clear when he didn't come to the city council meeting . . . . [and d]idn't show up for his responsibilities." (Doc. 33-4 at 25).  Haygood still sent the letter and email, however, "so we would know clearly that that's what he had intended." (Doc. 33-4 at 25).

Later in the afternoon of March 15, 2023, Yolanda emailed Haygood, Lee, and the city attorney, Milton Davis ("Davis"), stating the following:

> This email is to inform you that the City Manager, Derrick Swanson contacted my office requesting leave for his own personal health matter.  The appropriate documents have been sent from the human resources office and copies are in the files. The length of leave is undetermined, pending certification from the health care provider.

(Doc. 38-10; doc. 33-3 at 6; doc. 33-4 at 13–14; doc. 33-5 at 4–5).  Later that day, Davis forwarded the email to Clark, who then forwarded it to Haygood's city email. (Doc. 33-3 at 6).  Although he could not remember if he read Yolanda's email on March 16 or 17, Haygood acknowledged that on either March 16 or March 17, he was informed that Swanson had requested leave. (Doc. 33-4 at 24).

On March 16, Swanson received the March 15 letter from Haygood.  At 12:20 a.m. on March 17, Swanson emailed Haygood, Clark, Lee, Davis, and Yolanda, stating that he was "not resigning the position as City Manager for the City of Tuskegee." (Doc. 38-13; doc. 33-2 at 34–35, 49; doc. 33-3 at 7).  Swanson further stated that he had determined that

the evaluation was a "Bashing Session" and that he went to HR "for assistance because of a terrible headache due to stress stemming from a hostile and toxic work environment." (Doc. 38-13; doc. 33-2 at 35).  He also stated that he had seen a "doctor for headaches and blurry vision," needed anxiety medication and increased blood pressure medication, and needed to return to the doctor in April for a heart evaluation because of a concern with his EKG. (Doc. 33-2 at 35; doc. 38-13).  Swanson then stated that they should have received an email on March 15 from Yolanda notifying them of his request for leave. (Doc. 33-2 at 35).[4]  Clark told Haygood about Swanson's email the morning of March 17. (Doc. 33-3 at 8).  Haygood admitted that Swanson sent the email before the deadline of 12:00 p.m. on March 17. (Doc. 33-4 at 37).

In the afternoon of March 17, the city council met without Swanson where they voted to vacate the position of city manager. (Doc. 33-3 at 8).  Clark testified that nothing was mentioned on the subject of Swanson's FMLA leave at the meeting. (*Id.* at 8–9). Sometime in the afternoon on March 17, Haygood sent an official notification to Swanson that the city council adopted a resolution declaring the office of the city manager vacant, and that Ulysses L. Roberts ("Roberts") was officially appointed as the temporary acting city manager. (Doc. 38-25; doc. 33-4 at 35).  Haygood also requested that Swanson surrender all keys and property of the City by March 23, 2023. (Doc. 38-25).

On March 23, 2023, The Tuskegee News, a local newspaper, ran an article written by Guy Rhodes ("Rhodes") with the following headline:  "Swanson out as Tuskegee City

---

[4] Swanson wrote "May 15, 2023" in his email, but he acknowledged in his deposition that the email contained an error and that he meant "March 15, 2023." (Doc. 33-2 at 35–36).

Manager; Roberts serving as the interim." (Doc. 38-26 at 1–2; doc. 33-2 at 45; doc. 33-4 at 36).  The article stated in relevant part:

> Derrick Swanson is out as Tuskegee's city manger [sic] after he left during a meeting for his evaluation on Monday, March 13.
> Swanson did not return to the city manager's office the next day and wasn't in attendance at the Tuesday, March 14 meeting of the Tuskegee City Council.
>
> . . .
>
> The council then appointed Ulysees [sic] Roberts as temporary acting city manager during a called meeting on Friday, March 17. . . .
>
> . . .
>
> Tuskegee Mayor Tony Haygood said the council was willing to work with Swanson on some issues raised during the evaluation, but had to move on after getting no timely response from Swanson after he left evaluation meeting [sic].

(Doc. 38-26 at 2–3).  Haygood testified that in his capacity as mayor, he had spoken to Rhodes "[n]umerous times" (doc. 33-4 at 36), and that he "probably" told Rhodes that Swanson had not timely responded after leaving his evaluation meeting (*id.* at 37).

Yolanda eventually received the necessary medical documentation for Swanson's FMLA leave certification in the required 15-day window. (Doc. 33-5 at 9; *see also* doc. 38-2).  On March 28, 2023, Yolanda emailed Haygood stating that Swanson's FMLA physician indicated that his treatments are expected to be completed around April 27, 2023. (Doc. 38-16; doc. 33-4 at 13).

## V. DISCUSSION

Swanson contends that when the City terminated him, it willfully interfered with his request for FMLA leave and retaliated against him for requesting such leave. Swanson further claims that Haygood's statements, which were published in Rhodes' article for The Tuskegee News, constitute defamation under Alabama law. The City counters that Swanson was not eligible for FMLA leave when he requested it, he did not have a qualifying condition, and he did not properly notify the City of his leave request. Additionally, the City argues that Swanson's defamation claim fails because he cannot show that any statements in the article were false and because he does not know who provided the allegedly defamatory statements. The Court first addresses Swanson's FMLA claims before turning to his defamation claim.

### A. FMLA Claims

"The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (citing 29 U.S.C. § 2612(a)(1)(D)). Moreover, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." 29 U.S.C. § 2615(a)(1). The Eleventh Circuit has recognized that "the FMLA prohibits employers both from interfering with employees' rights under the FMLA (interference claims) and from retaliating against employees for exercising their rights under the FMLA (retaliation claims)." *Tanner v.*

*Stryker Corp. of Michigan*, 104 F.4th 1278, 1284 (11th Cir. June 20, 2024) (parentheticals in original).  The Court begins with Swanson's interference claim before turning to his retaliation claim.

### 1. Willful Interference with Request for Leave

The City argues that Swanson's claim for FMLA interference fails because he was not entitled to FMLA leave, he cannot show he was suffering from a qualifying condition when he requested leave, and he did not provide notice to the City of his need for FMLA leave.   The Court begins with the City's arguments concerning Swanson's entitlement to FMLA leave.

### a. Entitlement to FMLA leave

The City first contends that Swanson was not entitled to FMLA leave because the resolution establishing Swanson's employment "d[id] not state that Swanson was eligible for FMLA leave" and provided that Swanson may be terminated without cause. (Doc. 34 at 11).  Second, the City argues that Swanson was not entitled to FMLA leave because he had already resigned when he requested leave. (Doc. 34 at 11–12).  Swanson, in turn, argues that the resolution establishing his employment does not affect his entitlement to FMLA leave and that the evidence, viewed in his favor, shows that he did not resign.

"To establish that an employer interfered with [his] FMLA rights, an employee need only show by a preponderance of the evidence that []he was entitled to the benefit that h[is] employer denied." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1338 (11th Cir. 2021) (citing *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010)).  The

employee need not show that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Krutzig*, 602 F.3d at 1235  (citation omitted).

The Court first turns to whether Swanson was entitled to FMLA leave based on the resolution establishing his employment.  Swanson is correct that his FMLA eligibility "is governed by federal law" and not "the City's hiring resolution." (Doc. 38 at 12).  As stated above, the FMLA makes it "unlawful for *any employer* to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." 29 U.S.C. § 2615(a)(1) (emphasis added).  Based on the statute's plain text, the FMLA's applicability depends on whether the defendant is an "employer" under the Act, not on provisions in an employment contract.  Under the Act, "[t]he term 'employer' . . . includes any 'public agency', as defined in section 203(x) of this title." 29 U.S.C. § 2611(4).  Section 203(x) in turn defines "public agency" as "the government of a State or political subdivision thereof; . . . a State, or a political subdivision of a State."  The City does not dispute that it is a public agency under this definition and thus is subject to the FMLA.  Additionally, "[e]mployees cannot waive, nor may employers induce their employees to waive, their prospective rights under [the] FMLA." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1123 (11th Cir. 2004) (emphasis omitted) (quoting 29 C.F.R. § 825.220(d)).  Thus, the City's first argument that Swanson was not entitled to FMLA leave lacks merit.[5]

---

[5] The City does not dispute that Swanson had worked for the City for at least twelve months and for at least 1,250 hours during that period. *See* 29 U.S.C. § 2611(2) (defining "eligible employee").  Thus, at this stage, Swanson was an "eligible employee" for FMLA purposes. *See id.*

The City next argues that Swanson was not entitled to FMLA leave because, according to the City, Swanson undisputedly resigned at the March 13, 2023 meeting before he requested leave.  Swanson counters that summary judgment is inappropriate because the record contains evidence that he did *not* resign, and that in any event, the City did not accept his resignation before he requested FMLA leave.

Viewing the evidence and all reasonable inferences in Swanson's favor, a genuine dispute of material facts exists as to whether Swanson resigned before he requested FMLA leave.  Although he testified that he did not remember what he said at the March 13 meeting, he also testified multiple times that he did not resign (*see, e.g.*, doc. 33-2 at 44).  Swanson's testimony, if believed, would permit a reasonable jury to conclude that Swanson did not resign at the March 13 meeting.  Consequently, the City's argument that Swanson was not entitled to FMLA leave because he had already resigned is unavailing at this stage.

Additionally, Swanson has at least created a genuine dispute of material fact about his entitlement to FMLA leave for an additional, independent reason:  a reasonable jury could conclude that the City had not accepted his resignation before he requested FMLA leave.  Pursuant to 29 C.F.R. § 825.311(b), "[i]f an employee gives unequivocal notice of intent not to return to work," then the employer's obligations under the Act "to maintain health benefits . . . and to restore the employee cease."  But "these obligations continue if an employee indicates he or she may be unable to return to work but expresses a continuing desire to do so." 29 C.F.R. § 825.311(b).  Citing § 825.311(b), the Eleventh Circuit concluded, in an unpublished opinion, that an employer's acceptance of an employee's

resignation terminated the employer's obligations to provide FMLA benefits. *See Blake v. City of Montgomery*, 2021 WL 5177429, at *7 (11th Cir. Nov. 8, 2021) (per curiam).[6]

In *Blake*, the plaintiff told his district chief that "he couldn't do it anymore" and would turn his things in if needed. *Id.* at *2.   The plaintiff acknowledged that this was an expression of an intent to resign, but he declined to put his intent in writing. *Id.*  The district chief still memorialized the exchange in an internal memo. *Id.*  Two of the plaintiff's colleagues told the district chief that the plaintiff's decision was "not permanent," and the district chief told the plaintiff in a subsequent conversation that "he was not past the point of no return." *Id.*  However, before the plaintiff had retracted his earlier statement about resigning or put the city on notice that he required FMLA leave, the plaintiff was informed by his employer that his verbal resignation had been accepted and that he was no longer employed. *Id.* at *3.  The Eleventh Circuit concluded that "[o]nce the [employer] accepted his resignation, that terminated its obligations to provide him FMLA benefits." *Id.* at *7 (citing 29 C.F.R. § 825.311(b)).

Even assuming that Swanson undisputedly stated his intent to resign at the March 13 meeting, a reasonable jury could find that the City had not accepted his resignation when he requested FMLA leave.  Viewing the evidence in Swanson's favor, the record reflects that on March 15, two days after the meeting and Swanson's request for FMLA leave, the City, via Haygood, sent Swanson a letter containing what could reasonably be interpreted as an opportunity for Swanson to remain in the city manager position, and further requested

---

[6] Here, and elsewhere in this Opinion, the Court cites nonbinding authority.  While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

a response from Swanson by noon on March 17.  The City's letter used phrases such as "As you make a clear determination of your choice and intent," and "[w]hichever path you choose. . . ," which permit a reasonable inference that the City had not yet accepted Swanson's resignation.  Similarly, the letter stated that if the City did not receive Swanson's written response regarding his intent, the City would assume that his verbal statement at the meeting "was the official resignation notification to the City of Tuskegee." This statement also permits a reasonable inference that the City had not yet accepted Swanson's resignation.  Additionally, Haygood's March 15 text message to Swanson stating that the city council was "willing to continue working with him if [they] establish better communication" (doc. 33-8 at 2) would permit a reasonable jury to conclude that the City had not yet accepted Swanson's resignation.  Swanson responded before the City's deadline that he was "not resigning the position as City Manager for the City of Tuskegee." (Doc. 38-13).  Unlike *Blake*, this record contains insufficient evidence that the City had accepted Swanson's resignation before he requested FMLA leave.  Thus, a reasonable jury could conclude that Swanson remained employed with the City when the City's letter was sent on March 15, and that he remained employed when he responded on March 17. Consequently, a reasonable jury could find that Swanson was entitled to FMLA leave when he requested it.

### b.  Qualifying condition and notice

The City next argues that Swanson cannot succeed on his FMLA interference claim because (1) he cannot show he was suffering from a qualifying condition at the time he

requested FMLA leave, and (2) he failed to provide notice to the City of his need for FMLA leave.  The Court addresses each argument in turn.

An employee is entitled to take FMLA leave only if he suffers from a "serious health condition" which makes him "unable to perform the functions of [his] position." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1194 (11th Cir. 2015) (citation omitted).[7] A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility"; or "continuing treatment by a health care provider.'" 29 U.S.C. § 2611(11); *White*, 789 F.3d at 1194.  Department of Labor ("DOL") regulations define a "serious health condition involving continuing treatment by a health care provider" to include, among other circumstances, "Incapacity and treatment."   The regulations provide in relevant part:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
> > (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> > (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

---

[7] At this stage, the City does not challenge whether Swanson's condition made him unable to perform the functions of his position.

29 C.F.R. § 825.115(a).

The City compares this case to the symptoms of "burnout" which the Eleventh Circuit held to be insufficient to qualify as a serious health condition in *Blake*.  In *Blake*, the court concluded that the plaintiff failed to show that his burnout symptoms prevented him from working "for more than three whole days, as required to establish incapacity giving rise to a qualifying condition under the FMLA." 2021 WL 5177429, at *5.  The court observed that "[n]othing in the record" suggested that the plaintiff's symptoms made him unable to work for more than three consecutive days, and that the plaintiff himself acknowledged that he tried to return to work and "was ready to work mentally and physically" just two days after he told his supervisor he would not continue to work certain shifts. *Id.*

The Court finds this case distinguishable.  Unlike the plaintiff in *Blake*, Swanson has presented evidence that he suffered a panic attack, required multiple doctor's visits, and had multiple diagnoses.  The record supports a finding that Swanson suffered a panic attack and had to leave work, and that his doctor's concerns with his worsening anxiety, abnormal EKG, and heart issues warranted continuing treatment.  Further, the record shows that Yolanda ultimately received the proper physician's certification from Swanson certifying his need for leave.  And unlike the plaintiff in *Blake*, Swanson did not return or attempt to return to work three calendar days or fewer after his panic attack.  Swanson's testimony about his health issues, which required subsequent treatment; his physician's certification; his failure to return to work; and his communicating his health issues to Haygood three days after the panic attack would allow a reasonable jury to find that he

suffered a period of incapacity for three or more consecutive calendar days. *See* 29 C.F.R. § 825.115(a). This evidence is also sufficient to permit a reasonable jury to find that Swanson either received (a) treatment two or more times within thirty days of the first day of incapacity, or (b) treatment by a healthcare provider on at least one occasion resulting in a regimen of continuing treatment. *Id.* Consequently, the City's argument that Swanson did not have a qualifying condition fails at this stage.

Additionally, a reasonable jury could find that Swanson properly notified the City about his serious health condition. "An employee suffering from a serious health condition can state an interference claim only if he gave his employer proper notice of his need for leave." *Blake*, 2021 WL 5177429, at *4. The FMLA ordinarily requires the employee to provide 30 days' notice of leave when the need to take leave is foreseeable; but if the need is unforeseeable, as Swanson's was here,[8] "notice must be given as soon as practicable." *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (citing 29 C.F.R. § 825.302(a)). "[T]he employee need only provide [his] employer with notice sufficient to make the employer aware that [his] absence is due to a *potentially FMLA-qualifying reason*." *Id.* (emphasis in original) (citation omitted).

Further, an employee need not expressly assert his right to take leave under the FMLA. *Id.* at 1383 (citing 29 C.F.R. §§ 825.302(c), 825.303(b)). "However, the notice must be 'sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.'" *Id.* (citing 29 C.F.R.

---

[8] The City does not dispute, at this stage, that Swanson's need for leave was unforeseeable.

§ 825.302(c)).  Once an employee gives his employer sufficient notice that he potentially needs FMLA-qualifying leave, "the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection." *Id.* (citation omitted).

The City argues that Swanson cannot show that he provided proper notice because he did not notify the city council, Swanson's alleged "department head," as required by City policy and instead only notified Yolanda, the HR Director. (Doc. 34 at 15).  The Court finds this argument unavailing for several reasons.  First, DOL regulations regarding unforeseeable leave provide that "advance notice pursuant to an employer's internal rules and procedures" is not always required "when FMLA leave is involved." 29 C.F.R. § 825.303(c).  Moreover, the City cites Yolanda's deposition as evidence that Swanson was required to notify the city council (doc. 34 at 16) (citing doc. 33-5 at 16), but Yolanda also testified that she "assume[d] the mayor and the council president" were Swanson's department heads (doc. 33-5 at 16).  Yolanda further testified that "[s]ometimes we have employees that will notify their department head beforehand.  Sometimes we don't." (*Id.*).  Additionally, Haygood testified that "under special conditions," an employee "may go directly to HR." (Doc. 33-6 at 8).

Also, within days of Swanson requesting leave from Yolanda and before the City terminated Swanson, Haygood and the other city councilmembers had received both the email from Yolanda indicating that Swanson was taking leave for "personal health reasons," which also included a reference to a "certification from the health care provider," and the email from Swanson describing his anxiety, blood pressure, troubling EKG, and heart issues requiring subsequent evaluation by his doctor.  While the City emphasizes that

neither email expressly mentioned the FMLA, the lack of express reference to the FMLA is not dispositive. *See Cruz*, 428 F.3d at 1383.  Taken together, Swanson's conversation with Yolanda—the City's HR Director who handles all FMLA requests—about FMLA leave, Yolanda's subsequent email to Haygood and other councilmembers that Swanson was taking leave for "personal health reasons," and Swanson's email describing his symptoms and treatment, are sufficient for a reasonable jury to conclude that the City had proper notice of Swanson's request for FMLA leave. *See White*, 789 F.3d at 1197 (concluding that notice was adequate where the plaintiff informed her employer "that her knee 'gave out,' that it 'was painful,' that she 'could [not] put any weight on it,' and that she had received a referral to an orthopedic surgeon" (alteration in original)).  That is, this evidence provided the City "with notice sufficient to make the [City] aware that [Swanson's] absence is due to a *potentially FMLA-qualifying reason*." *See id.*; *Cruz*, 428 F.3d at 1382.  Consequently, the Court concludes that the motion for summary judgment is due to be denied as to Swanson's FMLA interference claim.

### 2.  Retaliation for Request for Leave

The City argues that Swanson's retaliation claim also fails because he did not provide the City with proper notice of his leave.  For the reasons explained above, Swanson has presented evidence sufficient to allow a reasonable jury to conclude that the City had adequate notice of Swanson's request for leave when it decided to terminate him.  Thus, the Court finds this argument unavailing.  The City also renews its argument that Swanson resigned before he was terminated, which the Court has already considered and rejected.

The Court finds that Swanson has proffered evidence sufficient for a jury to conclude that the City retaliated against him for requesting FMLA leave.  "Where an employee alleges FMLA retaliation without direct evidence of an employer's retaliatory intent, '[courts] apply the burden shifting framework established in' *McDonnell Douglas Corp. v. Green*[, 411 U.S. 792 (1973)].'" *Tanner*, 104 F.4th at 1288 (citation omitted). "First, the employee must make a prima facie case showing that: (1) [he] engaged in statutorily protected conduct; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the two." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1275 (11th Cir. 2020) (citation omitted).  "Next, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action.  If the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual." *Id.* (citations omitted).

First, viewing the evidence in his favor, Swanson engaged in statutorily protected conduct when he requested FMLA leave from Yolanda.  Second, Swanson plainly suffered an adverse employment action when he was terminated, and the City does not argue otherwise. *See id.* at 1276 (recognizing termination as an adverse employment action).

The Court finds that Swanson has also satisfied the third element for purposes of summary judgment.  "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were "not wholly unrelated." *Krutzig*, 602 F.3d at 1234 (citing *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff

shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.*

For the reasons explained above, before the City decided to terminate Swanson on March 17, the City had sufficient notice that Swanson had requested FMLA leave. Swanson has also proffered sufficient evidence for a reasonable jury to conclude that his request for FMLA leave and his termination were "not wholly unrelated." *See id.* "While '[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action[,] . . . mere temporal proximity, without more, must be "very close."'" *McAlpin v. Sneads*, 61 F.4th 916, 932 (11th Cir. 2023) (alterations in original) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  The temporal proximity between the City's notice of Swanson's request for FMLA leave and his termination—less than four days—is "very close" and would permit a reasonable jury to conclude that Swanson had established causation. *See Hurlbert*, 439 F.3d at 1298 (reversing the district court's grant of summary judgment in favor of employer and concluding that the plaintiff had established causation where his termination occurred "no more than two weeks" after his request for FMLA leave).  The City does not argue otherwise; it simply maintains that it did not have proper notice of Swanson's FMLA leave request, an argument which this Court has considered and rejected.

The City contends that it terminated Swanson because "he both resigned and failed to perform his job duties." (Doc. 34 at 19).  Although the City does not frame this contention as nondiscriminatory reasons for Swanson's termination, the Court will assume

without deciding that the City has met its burden in this regard.  Once the employer articulates a nondiscriminatory reason for its termination decision, the burden shifts to Swanson to introduce evidence to allow a reasonable factfinder to conclude that the City's reasons for terminating him are pretextual.  "To show pretext, an employee must introduce evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Munoz*, 981 F.3d at 1277 (citing *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017)).  "This evidence may include the evidence already produced by the employee to establish [his] prima facie case." *Id.*

The Court finds that Swanson has marshaled sufficient evidence from which a reasonable jury could conclude that the City's proffered reasons for terminating him were pretextual.  "The close temporal proximity between [Swanson's] request for leave and his termination"—four days—although insufficient by itself to establish pretext, is evidence of it. *See Hurlbert*, 439 F.3d at 1298.  Additionally, Swanson points to the lack of evidence of any intent to terminate Swanson before his request for leave, and "[i]f the City truly had an issue with Swanson's nonappearance on March 14-16, or if the City truly believed that Swanson intended to resign, one would have expected the Mayor's letter to raise those issues.  Instead, the letter gave Swanson a 12:00 p.m. deadline to state whether he intended to return." (Doc. 38 at 27).  Further, Haygood's letter specified that the City was willing to work with Swanson moving forward despite the concerns raised in Swanson's evaluation. The only substantial change in circumstances in the time between Haygood's letter and the decision to terminate Swanson was the City learning that Swanson had requested FMLA

leave. This evidence is sufficient for a reasonable jury to find "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered nondiscriminatory reasons and to conclude that the City's proffered reasons were "not the real reasons" for Swanson's termination. *See Munoz*, 981 F.3d at 1277 (citation omitted). Thus, a reasonable jury could conclude that the City's reasons for terminating Swanson were pretextual. Consequently, the motion for summary judgment is due to be denied as to the FMLA retaliation claim.

### B. Defamation

The City argues that it is entitled to summary judgment on Swanson's defamation claim because he cannot show that Rhodes' article for The Tuskegee News contained any false statements. The City also contends that Swanson has no evidence that the City provided those statements to the newspaper. Swanson counters that the article's statement that the city council had not gotten a timely response from him after he left the evaluation meeting was false. Swanson also argues that the record contains sufficient evidence that Haygood, and thus the City, provided the statements to the newspaper.

A claim for defamation under Alabama law requires the plaintiff to show:

> 1) [A] false and defamatory statement concerning the plaintiff;
> 2) an unprivileged communication of that statement to a third party; 3) fault amounting to at least negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Flickinger v. King*, 385 So. 3d 504, 512 (Ala. 2023) (alteration and emphasis in original) (quoting *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 186 (Ala. 2016)). At this stage, the

City does not argue that the challenged statement is not defamatory or that it is not actionable.  The City also does not argue that Haygood's actions, if true, are insufficient to impute defamation liability to the City.

The Court begins with falsity.  Swanson argues that the article's statement, attributed to Haygood, that Swanson gave "no timely response" after he left the evaluation meeting was false because Swanson did respond before the City's deadline of 12:00 p.m. on March 17. (Doc. 38-26 at 3).  At this stage, it is undisputed that Swanson responded by the deadline.  Swanson testified that he emailed Haygood and others shortly after 12:00 a.m. on March 17—about twelve hours before the deadline—stating that he was not resigning.  Haygood admitted that Swanson sent the email before the deadline. (Doc. 33-4 at 37).  The City contends that while Swanson did respond to Haygood's letter, Swanson did not perform any of his job duties following the March 13 meeting. (Doc. 34 at 20).  But whether Swanson performed his job duties is not relevant to the truth or falsity of the article's statement that Swanson did not timely respond.  Given Swanson's and Haygood's testimony that Swanson did timely respond, a reasonable jury plainly could conclude that the article's statement to the contrary was false.

At this stage, the City's argument that Swanson cannot show that the City provided the challenged statement to the newspaper also fails.  Rhodes' article itself quotes Haygood as saying that the council "had to move on after getting no timely response from Swanson after he left evaluation meeting [sic]." (Doc. 38-26 at 3).  Additionally, Haygood testified that he "probably did" give this information to Rhodes (doc. 33-4 at 37), and that in his capacity as mayor, he had spoken to Rhodes "[n]umerous times" (*id.* at 36).  Viewing the

evidence and all reasonable inferences in Swanson's favor, a reasonable jury could conclude that the City, through Haygood, told the newspaper that Swanson did not timely respond.

The City also contends that Swanson cannot show *when* Haygood made the allegedly defamatory statement to Rhodes.  The City does not explain the relevance of the timing of Haygood's statement.  In any event, given the article's statement that Swanson did not timely respond after leaving the meeting, coupled with the article's publication several days after the City's deadline, a reasonable jury could conclude that Haygood made the challenged statement to Rhodes—that Swanson did not timely respond—*after* the deadline of 12:00 p.m. on March 17 and after Swanson had timely responded.  It follows that a reasonable jury could conclude that Haygood knew the challenged statement was false when he made it.  To the extent the timing is relevant to the fault element of Swanson's defamation claim, a reasonable jury could find that the City was at least negligent because Haygood knowingly made the false statement (or so a jury could reasonably conclude).  Consequently, summary judgment is due to be denied as to the defamation claim, and the City's motion for summary judgment is due to be denied in its entirety.

## VI.  CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED that the City's motion for summary judgment (doc. 33) is DENIED.

DONE this 3rd day of September, 2024.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE